# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ADRIAN GONZALEZ, | ) | |
| | ) | No. 12 CV 10262 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, [1] | ) | |
| | ) | September 16, 2014 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Adrian Gonzalez seeks disability insurance benefits ("DIB"), 42 U.S.C. §§ 416(i), 423, based on his claim that he is disabled by a combination of knee pain and depression. After the Appeals Council declined to review an administrative law judge's ("ALJ") decision denying his application, Gonzalez filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Currently before the court are the parties' cross motions for summary judgment. For the following reasons, Gonzalez's motion for summary judgment is granted and the government's motion is denied:

### Procedural History

In August 2009 Gonzalez filed an application for a period of disability and DIB, claiming a disability onset date of July 16, 2005. (Administrative Record "A.R." 159.) After his claims were denied initially and upon reconsideration, (id. at

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

79-80), Gonzalez requested and was granted a hearing before an ALJ. That hearing took place on April 7, 2011. (Id. at 34-78.) On June 8, 2011, the assigned ALJ denied Gonzalez's application. (Id. at 29.) The Appeals Council declined review, (id. at 7-13), making the ALJ's decision the final decision of the Commissioner of Social Security, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). After seeking and receiving an extension of time to file a suit seeking judicial review of the Commissioner's final decision, Gonzalez filed his complaint on December 21, 2012. *See* 42 U.S.C. § 405(g). The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c).

## Facts

Gonzalez's 22-year career as a carpenter came to an abrupt end on July 16, 2005, when he fell to the ground from a height of six feet while at work, suffering what his doctor later would describe as a "severe and devastating injury" to his right leg. (A.R. 195, 288, 324.) After surgery and extensive physical therapy, Gonzalez reinjured his knee in 2007 by falling down a set of stairs. (Id. at 689.) He claims that the leg pain, knee swelling, and depression stemming from his injuries make it impossible for him to work. At his hearing before the ALJ, Gonzalez presented both documentary and testimonial evidence in support of his claim.

## A.      Medical Records

Gonzalez's July 2005 fall caused a right tibial plateau fracture which required surgery. (A.R. 362.) Two months after his surgery Gonzalez began what would be a ten-month course of physical therapy. (Id.) At his initial evaluation his

physical therapist noted that Gonzalez was experiencing moderate right knee pain, significant swelling throughout his lower right leg, and severely decreased mobility. (Id. at 595.)  At the end of his physical therapy Gonzalez's physical therapist provided a residual functional capacity ("RFC") assessment in which he opined that Gonzalez is capable of performing at the medium physical demand level for activities above the knees but only the sedentary level below the knee.  (Id. at 606.) After Gonzalez reinjured his right knee in a July 2007 fall, his physical therapist noted that he had increased swelling in his right knee and moderate impairments with walking, sitting, and standing.  (Id. at 689-92.)

Gonzalez sought medical treatment for his knee pain with Dr. Miguel Jimenez, who noted in November 2007 that Gonzalez was tearful, despondent, and depressed.  (Id. at 345.)  Because Gonzalez was experiencing popping, clicking, and swelling in his right knee, Dr. Jimenez recommended arthroscopic surgery.  (Id. at 345-46.)  Over a year later, in December 2008, Dr. Jimenez performed the surgery to correct what he described as the residual deficits stemming from medial and lateral meniscal tears.  (Id. at 263-64.)  Gonzalez re-enrolled in physical therapy the following month, reporting severe pain in walking, sitting, and standing.  (Id. at 362, 364.)  At a February 2009 surgical follow-up Dr. Jimenez noted that Gonzalez had developed post-traumatic degenerative changes in his knee and that he was suffering from pain and swelling.  (Id. at 272-73.)  Dr. Jimenez wrote that Gonzalez should be permanently restricted from work and would likely need total knee arthroplasty if his post-traumatic osteoarthritis continued.  (Id. at 273.)

3

In October 2009 Gonzalez underwent a psychological evaluation with Glen Wurglitz, Psy.D., at the behest of the state disability determination services office. (Id. at 282.) Dr. Wurglitz observed that Gonzalez sat uncomfortably, was tearful and anxious, and had trouble remaining focused. (Id.) Gonzalez told Dr. Wurglitz that he was seeing a psychiatrist who prescribed him Cymbalta, but that he was unable to take the medication because his insurance would not cover it. (Id. at 283.) Dr. Wurglitz diagnosed Gonzalez as having major depressive disorder of moderate severity. (Id. at 286.)

Gonzalez next underwent an internal medicine consultative examination with Dr. Stanley Simon, who noted that Gonzalez reported having leg pain at a level of five out of ten. (Id. at 288.) Gonzalez reported that he relieved the pain by elevating his leg. (Id.) Dr. Simon examined Gonzalez and noticed no swelling in the right knee, but observed diffuse tenderness and reduced range of motion in the knee. (Id. at 290.) He also noted that Gonzalez was obese, carrying 224 pounds on his 5'-10" frame. (Id. at 289.)

Following these examinations, in December 2009 two state agency doctors reviewed Gonzalez's records and gave their opinions regarding his RFC. Consulting psychologist Dr. Kirk Boyenga rated Gonzalez as having moderate difficulties in social functioning and only mild difficulties in activities of daily living or concentration, persistence, or pace. (Id. at 303.) He reported that he found Gonzalez only partially credible, because "objective medical evidence in the file does not support the severity of the claimant's allegations." (Id. at 305.) Dr. Richard

Bilinsky completed a physical RFC, opining that Gonzalez can sit, stand, or walk for six hours in an eight-hour day with only occasional kneeling or crouching. (Id. at 312-13.) He used the same language as Dr. Boyenga in justifying his finding that Gonzalez's statements were only partially credible. (Id. at 318.)

Beginning in February 2010 Gonzalez began seeking medical treatment from Dr. Mary Hensley. He reported that he had been in bed for two weeks because he was depressed. (Id. at 498.) Dr. Hensley noted that Gonzalez walked with a limp and had a right knee deformity. (Id. at 499.) She assessed him as having depression, obesity, fatigue, and a lower leg joint disorder. (Id.) In the months that followed Hensley prescribed Prozac which improved Gonzalez's depression, although she observed that his lower leg joint disorder was worsening. (Id. at 514, 521.) In her most recent examination notes dated February 10, 2011, Dr. Hensley observed that Gonzalez had a depressed affect and worsening obesity, and recommended physical therapy to deal with his right knee pain. (Id. at 528.)

## B.    Gonzalez's Testimony

At his April 2011 hearing before the ALJ, Gonzalez described on-going pain in his knees and hip and told the ALJ that he had not left his room for the previous week because he was depressed and crying a lot. (A.R. 46-47.) He was taking Prozac for his depression but he did not think it was helping "that much." (Id. at 47.) He also said that he was taking prescription strength Advil, but it did not ease his pain. (Id. at 48-49.) Gonzalez said that his leg gets numb when he sits for an hour and he has to get up and walk around when that happens. (Id. at 52.)

Gonzalez thought that he could sit for at most two hours at a time and stand for only 30 minutes. (Id. at 60.) He also said that he needs to elevate his right knee for 20 minutes four or five times each day to bring down the swelling. (Id. at 55, 62-63.)

In describing his daily activities, Gonzalez testified that before his accident he enjoyed watching his five children play sports, but that he has not been able to attend their games or practices after his injury. (Id. at 51.) Gonzalez said that on a good day he will wash dishes for 30-minute stints, between which he has to take breaks. (Id. at 55.) He occasionally drives with his son to the grocery store, which is only four blocks from his house. (Id. at 58-59.) He said that lately he does not get out of bed very much and that he naps for three hours every afternoon. (Id. at 53-54.)

## C. The Vocational Expert's Testimony

The ALJ elicited the testimony of vocational expert ("VE") Pamela Tucker to discuss the kinds of jobs a person of Gonzalez's age and educational history with certain hypothetical limitations would be able to perform. When asked about a person who could sit for six hours and stand or walk for no more than two hours in an eight-hour work day with restrictions such as routine and repetitive tasks and no more than occasional contact with the general public, the VE testified that this hypothetical person could work as an address clerk, document preparer, or automatic grinding machine operator. (A.R. 74-75.) She testified that there are 915 address clerk positions, 1,300 document preparer positions, and 250 automatic grinding machine operator positions in the region, defined as the State of Illinois.

(Id. at 70, 75.)  The VE clarified that a person who needed to elevate his legs during breaks and his lunch hour would still be able to perform those jobs.  (Id.)  Under questioning from Gonzalez's attorney, the VE testified that if the hypothetical person the ALJ described had to take a break every two to three hours, or could not stand for a half hour, there would be no work available.  (Id. at 76-77.)

**D.     The ALJ's Decision**

After hearing the proffered evidence, the ALJ concluded that Gonzalez is not disabled within the meaning of the Social Security Act.  (A.R. 29.)  In applying the standard five-step sequence for assessing disability, *see Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), the ALJ found at steps one and two that Gonzalez has not engaged in substantial gainful activity since July 16, 2005, and that he suffers from severe impairments including "status post fracture of right tibia, hypertension, obesity, poor vision, history of alcohol abuse, depression, and a history of posttraumatic stress disorder," (A.R. 19).  At step three the ALJ determined that none of Gonzalez's physical impairments meet or equal a listing, and, after applying the special technique for analyzing mental impairments, concluded that Gonzalez's depression is not presumptively disabling.  (Id. at 19-22.)

Before turning to step four of the required analysis, the ALJ determined that Gonzalez has the RFC to perform sedentary work involving the need to lift or carry 10 pounds occasionally or frequently, stand or walk no more than a total of two hours in an eight-hour day, and sit for about six hours in an eight-hour day, with occasional climbing.  (Id. at 22); *see also* 20 C.F.R. § 404.1520(e).  The ALJ further

determined that Gonzalez should be allowed to use a cane as needed and to walk for one to two minutes every sixty to ninety minutes. (A.R. 22.) She further determined that Gonzalez can perform both simple and detailed tasks that are routine and repetitive, can have no more than occasional contact with the general public, and "should not be required to perform fast-paced work." (Id.) In explaining the RFC, the ALJ found Gonzalez's testimony to be not entirely credible and that the medical record did not support limitations beyond those described in the RFC. (Id. at 23-27.)

Based on her view of Gonzalez's RFC, the ALJ concluded at step four that he could not return to his past work as a carpenter, but at step five she concluded that he could perform other jobs that exist in significant numbers in the national economy. (Id. at 27-28.) Specifically, the ALJ adopted the VE's testimony that someone with Gonzalez's RFC could work as an address clerk, document preparer, or automatic grinding machine operator, and that those jobs exist in significant numbers in the region, defined as the State of Illinois. (Id. at 28.) Accordingly, the ALJ ruled that Gonzalez is not disabled and denied his application for benefits. (Id. at 29.)

## Analysis

In moving for summary judgment, Gonzalez argues that the ALJ committed reversible errors in assessing his credibility, crafting his RFC, and relying on what he characterizes as erroneous VE testimony. This court reviews the ALJ's decision only to ensure that it is free of legal error and supported by substantial evidence.

42 U.S.C. § 405(g); *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003).

Substantial evidence means "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389,

401 (1971) (quotation omitted). In reviewing the Commissioner's decision the court

will not reweigh the evidence or substitute its judgment for that of the ALJ.

*Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). But where an ALJ ignores

highly relevant evidence or fails to "build a logical bridge" linking the evidence to

the conclusion, a remand is required. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir.

2010); *see also Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (noting that court

will not "simply rubber-stamp the Commissioner's decision without a critical review

of the evidence").

## A.    Credibility Analysis

The court begins with Gonzalez's challenge to the ALJ's credibility analysis,

because an erroneous credibility determination often tears the thread binding the

ALJ's decision in a way that makes the whole thing come unraveled. *See Pierce v.

Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (noting that an "erroneous credibility

finding requires remand unless the claimant's testimony is incredible on its face or

the ALJ explains that the decision did not depend on the credibility finding"); *see

also Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011) (noting that an inadequate

credibility determination is "reason enough" to reverse an ALJ's decision). This

court's review of the ALJ's credibility analysis is particularly deferential, asking

whether under a common sense reading that aspect of the decision is "patently

wrong," s*ee Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010), or whether it lacks a sufficient basis, *see Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). A credibility determination is patently wrong where it "lacks any explanation or support," *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008), or where it is marred by "fatal gaps or contradictions," *see Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) (quotation omitted).

Here the ALJ gave several reasons for finding that Gonzalez is "not entirely credible," the first of which is the familiar and oft-criticized boilerplate language stating that although "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the claimant's statements . . . are not credible to the extent they are inconsistent with the above [RFC] assessment." (A.R. 23, 25-26.) As Gonzalez points out, the Seventh Circuit has made clear that this language is "meaningless" and "backwardly 'implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (quoting *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)); *see also Goins v. Colvin*, No. 13-3729, __ F.3d __, 2014 WL 4073108, at *4 (7th Cir. Aug. 19, 2014). But "hackneyed" as this language might be, *see Shauger*, 675 F.3d at 696, its presence in an ALJ's decision is "innocuous" when it is backed up by a well-supported "explanation for rejecting the claimant's testimony," *Schomas*, 732 F.3d at 708. Because here the ALJ gave several reasons to explain her credibility finding, the presence of the backwards boilerplate alone does not amount to reversible error. *See id.*

Turning to the specific reasons the ALJ gave for discounting Gonzalez's testimony, three of those four reasons lack support in or rest on a mischaracterization of the record. The ALJ first noted that Gonzalez said he can "take care of his personal hygiene, prepare his children for school, wash dishes, go to the grocery store, and attend doctor and school appointments," and then concluded that "such level of activities of daily living is inconsistent with the claimant's alleged disabling limitations." (A.R. 25-26.) Although a claimant's daily activities are among the factors that an ALJ must consider in assessing credibility, *see* SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996), "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity," *Clifford*, 227 F.3d at 872. And here the ALJ's conclusion fails to account for Gonzalez's testimony regarding *how* he completes these tasks. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). Specifically, he testified that he does the dishes when he has "a good day," and even then he can only stand for 30 minutes before he has to stop to rest and elevate his knee. (A.R. 55.) The only detail he gave about getting his children ready for school involved giving them "some cornflakes for breakfast." (Id. at 212.) As for groceries, he explained that his son drives him to the store not for the big weekly grocery trip but if they need to get something, and then he does not lift anything that weighs more than five pounds. (Id. at 58-59.) The ALJ did not acknowledge the modified ways in which Gonzalez engages in his daily activities in finding them inconsistent with his claimed symptoms. *See Moss*, 555 F.3d at 562; *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2006) (faulting ALJ

for failing to mention that claimant performed chores "with difficulty, and with the aid" of other people).

More importantly, the Seventh Circuit has routinely warned against citing the kind of low-level, necessary daily activities the ALJ points to here as evidence that a claimant is not disabled. *See, e.g., Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013); *Bjornson*, 671 F.3d at 647; *Gentle*, 430 F.3d at 867-68; *Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004). The ALJ has not sufficiently explained why she finds inconsistent with Gonzales's pain allegations his abilities to take a (seated) shower, help his children—the youngest of whom was 11 at the time of the hearing, (A.R. 50)—get ready for school, or perform the other limited activities she cites. *See Beardsley v. Colvin*, No. 13-3609, __ F.3d __, 2014 WL 3361073, at *3 (7th Cir. July 10, 2014) ("[W]e have urged caution in equating [daily] activities with the challenges of daily employment in a competitive environment."); *Jelinek v. Astrue*, 662 F.3d 805, 812-13 (7th Cir. 2011) (reversing partly because ALJ did not explain why he perceived daily activities inconsistent with medical evidence).

Next the ALJ explains that she finds Gonzalez's complaints inconsistent with the medical record, which she characterized as "frequently demonstrat[ing] minor complaints and routine treatment." (A.R. 26.) In explaining that assertion she writes that Gonzalez was prescribed only "routine treatment with regards to pain management," and reported to a consulting physician that "his pain intensity level could go up as high as ten on a scale of ten" at the same time he conceded he had

not seen a doctor in a year. (Id.) First, this assertion rests on a misread of the cited evidence. The consulting physician wrote that Gonzalez said his "pain intensity is 5/10, with 10 being the worst." (Id. at 288.) In other words, when the physician told Gonzalez to rate his pain on a scale in which ten is the worst level of pain, Gonzalez put his pain at level five. Second, although a conservative course of treatment can be evidence that a claimant is exaggerating his claims, *see Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005), here Gonzalez's treatment included two surgeries, months of physical therapy, and prescription pain medications. Finally, to the extent the ALJ rested her conclusion on the fact that Gonzalez had a gap in treatment and was not taking pain medication in November 2009, she failed to discharge her duty to explore the possible reasons behind that treatment gap. *See Pierce*, 739 F.3d at 1050. Gonzalez told the consulting physician that he was not taking pain medication in November 2009 because his physician warned him against taking too many medications. (A.R. 288.) The ALJ may have been skeptical of that assertion (although a doctor treating chronic pain may have good reason to be leery of allowing a patient to remain on pain medications over a long term), but because she did not address it the court has no way to tell.

The ALJ also explained her adverse credibility finding by stating that "the medical record is void of any possible related impairments or symptoms" that would explain Gonzalez's claim that he naps for three hours each day. (Id. at 26.) That assertion is puzzling given the uncontradicted evidence and the ALJ's acknowledgment that Gonzalez was suffering from major depression. Fatigue and

daytime drowsiness are known symptoms of depression. Not only that, Dr. Hensley observed in her treatment notes that Gonzalez was experiencing fatigue. (Id. at 499, 510.) It should also be noted that fatigue often correlates with obesity, a condition that Dr. Hensley described as "worsening" in her most recent notes. (Id. at 528.) And as Gonzalez points out, although the ALJ acknowledged his obesity elsewhere in her decision, (Id. at 19, 24-25), she compounded her error here by failing to consider the combined impact that his obesity would have both on his fatigue and on his knee pain. *See Browning v. Colvin*, No. 13-3836, __ F.3d __, 2014 WL 4370648, at *6 (7th Cir. Sept. 4, 2014). Because this portion of the ALJ's credibility assessment rests on a mischaracterization of the medical evidence, it is insufficient to support her conclusion. *See Moss*, 555 F.3d at 562 (reversing where ALJ's assessment rests on misleading, inaccurate recitation of record).

That leaves only one reason standing in support of the ALJ's credibility assessment, and although it has stronger legs than the others, it is not sturdy enough to support the whole weight of the adverse credibility ruling. The ALJ writes that the medical record suggests that Gonzalez enjoyed significant improvement with treatment. (A.R. 26.) To explain the ALJ cites Dr. Hensley's notes from a May 2010 visit, in which Gonzalez reported being improved but having knee pain after doing yard work. (Id.) The ALJ pointed out that yard work "is outside the activities of daily living to which he testified." (Id.) Although it is true that Gonzalez did not mention yard work at the hearing, the ALJ did not ask him whether he performed that activity, and more importantly, he did acknowledge

doing yard work in the daily activity report the ALJ relied on in her discussion of his daily activities. (Id. at 208.) There he wrote that he does a "little mowing" for 10 minutes. (Id.) Therefore, to the extent the ALJ is suggesting Gonzalez tried to hide his yard work, that assertion is not borne out by the record.

To the extent the ALJ is implying that yard work is inconsistent with his claimed limitations, the fact that his attempt to do that work in short increments exacerbated his pain cuts against that implication. *See Scrogham v. Colvin*, No. 13-3601, __ F.3d __, 2014 WL 4211051, at *11 (7th Cir. Aug. 27, 2014) (noting ALJ erred in finding yard work cut against disability claim where claimant used lawn mower for 10 minutes at a time and was incapacitated after). Moreover, the notes the ALJ relied on to demonstrate that he improved with treatment state that his lower leg joint disorder was "worsening." (A.R. 522.) At bottom, because none of the ALJ's other reasons for discounting Gonzalez's testimony are supportable, the fact that Gonzalez reported improvement at one doctor's appointment (where he still reported pain) is insufficient on its own to support the ALJ's credibility finding. *See Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011) (observing that "[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the workforce"). Accordingly, the case must be remanded so the ALJ can conduct a new credibility analysis. That does not mean the ALJ must credit Gonzalez's testimony on remand, but rather she must provide "greater elaboration" to ensure the decision rests on "a sufficient basis." *See Zurawski*, 245 F.3d at 888.

## B.    RFC Assessment

Although the problems with the ALJ's credibility analysis necessarily cast doubt on the RFC assessment, *see Pierce*, 739 F.3d at 1051, in the interest of completeness the court will briefly address Gonzalez's RFC-specific arguments. Gonzalez challenges the ALJ's failure to incorporate into the RFC his fatigue and his need to elevate his leg several times a day to reduce swelling.  The ALJ did not incorporate any fatigue-related limitations into her RFC assessment because she rejected Gonzalez's testimony that he needs to nap for several hours a day. (A.R. 26.)  As discussed above, on remand the ALJ will need to reevaluate her view of the credibility of Gonzalez's fatigue complaints.  The need to lie down during the day can conflict with a claimant's ability to perform even sedentary work, *see Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013), and the VE testified at the hearing that someone whose fatigue would cause them to be off-task for more than 10% of a work day is generally unemployable, (A.R. 76-77).  Accordingly, to the extent that after a fresh look the ALJ finds Gonzalez's description of his need to nap credible or partially credible, she should incorporate that limitation into the RFC and reformulate her hypotheticals.  *See Buechele v. Colvin*, 11 CV 4348, 2013 WL 1200611, at *18 (N.D. Ill. Mar. 25, 2013).

As for Gonzalez's need to elevate his leg, the Commissioner argues that the ALJ was not required to incorporate that limitation into the RFC because there is no objective medical report stating that he "was required to elevate his leg every day, five times per day, to alleviate swelling, as Gonzalez alleges."  (R. 37, Def.'s

Mem. at 4.) The Commissioner also argues that the point is moot because the VE testified that even if Gonzalez needs to elevate his leg during breaks and his lunch time, there are jobs he could perform in the regional economy. (A.R. 73.) The problem with these arguments is that the ALJ neither cited a lack of objective medical records nor discussed the VE's testimony the government points to here in her discussion of the RFC. As the Seventh Circuit has made abundantly clear in numerous decisions, the government may not defend the ALJ's position based on reasons she did not articulate in her decision. *See Hanson v. Colvin*, No. 13-3473, __ F.3d __, 2014 WL 3732910, at *3 (7th Cir. July 30, 2014) (collecting cases). And contrary to the government's assertion, there are numerous instances in the medical record in which doctors noted Gonzalez's knee swelling and documented that symptom. (A.R. 273, 276, 324, 341, 345, 595, 689); *see Smith v. Astrue*, 467 Fed. App'x 507, 510-11 (7th Cir. 2012) (characterizing records documenting edema as evidence supporting claimant's testimony regarding need to elevate leg). Here, the ALJ never evaluated Gonzalez's testimony that he needs to elevate his leg for 20 minutes four to five times a day in order to reduce swelling and associated pain in his knee. (A.R. 55, 62.) It may be that the ALJ disbelieved Gonzalez's description of his swelling, but on remand she should expressly address this claimed limitation and either explain why she rejects it or discuss how it fits into her RFC assessment. *See Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) (noting that RFC must incorporate credible limitations that are produced by medically determinable impairment).

C.     **The VE's Testimony**

Gonzalez's final argument is that in concluding that there are a significant number of jobs that Gonzalez could perform in the regional economy, the ALJ relied on erroneous VE testimony.   First Gonzalez argues that the VE's testimony is unreliable because one of the jobs she identified, document preparer, is performed at the light exertional level according to the Dictionary of Occupational Titles.   But given that the VE identified two jobs that mesh with the RFC, any error with respect to the document preparer job could be overlooked as harmless, as long as the other jobs exist in significant numbers.   *See Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008) (characterizing VE error with respect to one job as "harmless" where VE described other jobs available to claimant).

Gonzalez's more significant argument with respect to the step-five analysis is his assertion that the VE erred in defining the "region" in which a significant number of relevant jobs exist as the entire State of Illinois.  (A.R. 70.)  He points out that the applicable statute and regulations make clear that the relevant geographic area for determining whether significant numbers of relevant jobs exist includes "the region where such individual lives or in several regions of the country."  *See* 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. §§ 404.1560(c), 404.1566(a).   The inquiry into the number of jobs available in the claimant's region or "several regions" does not turn on whether "[w]ork exists in the immediate area in which" the claimant lives.  *See* 20 C.F.R. § 404.1566(a)(1).  As such, Gonzalez argues that the VE erred in defining the relevant "region" as the entire State of Illinois and that the ALJ

erred in relying on that testimony to conclude Gonzalez is capable of performing jobs that exist in significant numbers. (*See* A.R. 28-29.)

Although the court is not unsympathetic to Gonzalez's point that the statute's and regulations' references to jobs available in "several regions" is not necessarily synonymous with jobs that are scattered throughout an entire state, it is clear that VEs routinely use state boundaries as a stand-in for "several regions," and the Seventh Circuit accepts the validity of that stand-in. *See, e.g., Weatherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011) (affirming ALJ's reliance on VE testimony regarding number of jobs available in Indiana); *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) (characterizing VE's job as identifying number of appropriate jobs available in claimant's state). The Seventh Circuit recently noted that the term "region" as set forth in an equivalent regulation to the one that governs here "presumably" encompasses "both a local area and the entire state." *Browning*, __ F.3d __, 2014 WL 4370648, at *6. As the court has acknowledged, "in our experience, and, it seems, that of the other circuits as well, the vocational experts who testify in social security disability cases concerning the availability of jobs that the applicant has the physical ability to perform almost always confine their testimony to indicating the number of such jobs that exist in the applicant's state, or an even smaller area." *Barrett v. Barnhart*, 368 F.3d 691, 692 (7th Cir. 2004) (collecting cases). Given the Seventh Circuit's acceptance of the practice Gonzalez challenges here, he has not shown that the VE erred in identifying the State of Illinois as the relevant statistical region.

That leaves open the question of whether the 2,465 jobs the VE identified (a figure that includes the number of document preparer positions) represent a "significant number" when the region is defined in that manner. In arguing that 2,465 is a significant number the government relies wholly on *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993), and cases cited therein, but with one exception the cited cases all dealt with a number of jobs in the 175-1,400 range on a local, rather than a state-wide level.[2] Similarly, in *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009), the Seventh Circuit stated that "it appears to be well-established that 1,000 jobs" constitutes a significant number in a case dealing with the number of jobs in the Milwaukee area. The government offers no argument as to whether and why it is appropriate to apply the same threshold for significance whether a VE describes the numbers of jobs available at a local level or a state-wide level, especially when dealing with a 102-county state like the State of Illinois. Gonzalez points out that some courts have declined to find job numbers in the 2,500 range significant when looking at numbers at the state level. *See, e.g., Mackins v. Astrue*, 655 F.Supp.2d 770, 773 (W.D. Ky. 2009) (noting no controlling authority that 900 jobs in state is significant number); *Racicot v. Astrue*, No. 04-11556-RWZ, 2007 WL 2712488, at *6 (D. Mass. Sept. 4, 2007) (noting lack of authority to support idea that 140 jobs in state is significant); *Mericle v. Sec'y of HHS*, 892 F.Supp. 843, 847 (E.D. Tex. 1995) (870 jobs in Texas not significant). On the other hand, courts in this

---

[2] The exception in the lists of citations found in both *Lee* and *Liskowitz* is *Trimiar v. Sullivan*, 966 F.2d 1326, 1330-32 (10th Cir. 1992), where the Tenth Circuit concluded that 850-1,100 jobs in the State of Oklahoma is significant.

circuit seem unblinking about the number of jobs available state-wide when those numbers push closer to and beyond the 10,000 mark. *See, e.g., Stanley v. Astrue*, 410 Fed. App'x 974, 975 (7th Cir. 2011) (40,000 jobs in Illinois sufficient); *Love v. Colvin*, 13 CV 3489, 2014 WL 2780136, at *4 (N.D. Ill. June 18, 2014) (75,100 relevant jobs in Illinois); *Burton v. Colvin*, 1:12-cv-676-DKL-WTL, 2013 WL 5486788, at *4 (S.D. Ind. Sept. 30, 2013) (9,000 jobs in Indiana significant).

Although it is not obvious that the same threshold for significance described in *Lee* and *Liskowitz* regarding jobs available at the regional level should apply at the state level, the Seventh Circuit's decision in *Weatherbee* leads this court to conclude that the number of jobs the VE described here as being available in Illinois satisfies the "significant number" threshold. In *Weatherbee*, the VE testified that the claimant could perform certain jobs which existed in a total of 3,900 positions in Indiana and 140,000 nationwide. 649 F.3d at 572. Without focusing on the difference between regions defined locally or statewide, the court cited the *Liskowitz* threshold, noting that "'it appears well-established that 1,000 jobs' constitutes a significant number." *Id.* (quoting *Liskowitz*, 559 F.3d at 743). It described the 3,900 positions in Indiana as "well above the threshold for significance," and found that the ALJ did not err in relying on that estimate to conclude that the claimant could work in positions that exist in significant numbers. *Id.* Here, even excising the number of document preparer jobs the VE cited, there are 1,165 jobs available to a person with the RFC the ALJ assigned to Gonzalez. Because that number exceeds what the Seventh Circuit has described as "the threshold for significance"

even when looking at state geography, *see id.*, the ALJ did not err in relying on the VE's testimony, *see Schadenfroh v. Colvin*, 1:13-cv-00223-SEB-DKL, 2014 WL 1260123, at *13 (S.D. Ind. Mar. 27, 2014) ("With no logical, principled standard by which to judge whether numbers of jobs are 'significant' under the Act, courts are left with hunches that are constrained only by the numbers that are held significant in precedential decisions."). Of course, if the ALJ finds on remand that a different RFC is appropriate, she will need to elicit new testimony from the VE regarding the kinds of positions available.

## Conclusion

For the foregoing reasons, Gonzalez's motion for summary judgment is granted and the Commissioner's is denied. The case is remanded for further proceedings consistent with this opinion.

**ENTER:**


_____
**Young B. Kim**
**United States Magistrate Judge**